FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 06, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DAREN R.,[1] | No.    2: 23-cv-03106-EFS |
| Plaintiff, | |
| v. | **ORDER AFFIRMING THE ALJ'S DENIAL OF BENEFITS** |
| MARTIN O'MALLEY, Commissioner of Social Security,[2] | |
| Defendant. | |

Due to the symptoms of ulcerative colitis, Daren R. claims he is unable to work full-time and applied for supplemental security income benefits. He appeals

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted for Kilolo Kijakazi as the defendant in this suit.

DISPOSITIVE ORDER - 1

the denial of benefits by the Administrative Law Judge (ALJ) on the sole ground that the ALJ improperly analyzed the credibility of Plaintiff's subjective complaints by failing to give clear and convincing reasons for rejecting Plaintiff's subjective testimony. Although the record reflects that Plaintiff's ulcerative colitis limits him physically, the Administrative Law Judge's (ALJ) nondisability finding is adequately explained and supported by substantial evidence. For the reasons that follow, the ALJ's decision is affirmed.

## I.    Background

In July 2019, Plaintiff filed an application for benefits under Title 16, claiming disability beginning June 1, 2019, based on ulcerative colitis.[3]

After the agency denied Plaintiff benefits, on October 6, 2022, ALJ C, Howard Prinsloo (the ALJ) held a hearing via telephone, at which Plaintiff and a vocational expert testified.[4] After the hearing, the ALJ issued a decision denying benefits.[5] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[6] As to medical opinions, the ALJ found:

---

[3] AR 178, 213.

[4] AR 34-58.

[5] AR 14-33 .  Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[6] AR 23-26.

- The opinions of state agency evaluators Charles Wolfe, MD, and Nancy Armstrong, MD, to be persuasive.

- The opinions of consultative examiner Hayden Hamilton, MD, as to lifting, carrying, sitting, and standing to be less persuasive and the opinions of Dr. Hamilton regarding environmental restrictions due to asthma to be unpersuasive.

- The opinions of state agency evaluators Vincent Gollogly, PhD, and W. Miller Logan, PhD, persuasive that Plaintiff does not have a severe mental impairment.

- The opinions of consultative examiner George Ankuta, PhD, that Plaintiff can follow and perform simple and complex tasks, attend to questions, sustain the pace of competitive work, tolerate work-related stress, and interact socially except for potential conflicts with authority figures to be persuasive.

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since July 3, 2019, the application date.

- Step two: Plaintiff had the following medically determinable severe impairment: ulcerative colitis.

- Also at step two, the ALJ found the following conditions to be non-severe: attention deficit hyperactivity disorder, and major depressive

disorder; and found that antisocial personality disorder was not a medically determinable impairment.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC:  Plaintiff had the RFC to perform a full range of work at the medium exertional levels with the exceptions that he could only frequently stoop and climb ladders, ropes and scaffolds.

- Step four: Plaintiff has no past relevant work because he has not performed work at the substantial gainful activity level.

- Step five: Plaintiff was able to perform jobs available in the national economy in substantial numbers as a kitchen helper (DOT 381.687-010), an auto detailer (DOT 915.687-034), and a motor vehicle assembler (DOT 806.684-010).[7]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[8]

---

[7] AR 19-29.

[8] AR 172.

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[9] and such error impacted the nondisability determination.[10] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]

## III.    Analysis

Plaintiff seeks relief from the denial of disability one single ground. He argues the ALJ erred when evaluating Plaintiff's subjective complaints, specifically

---

[9] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[10] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse a n ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[11] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

arguing that he erred in failing to account for Plaintiff's complaints that he has to take frequent bathroom breaks and that he has frequent flare-ups of his condition that would result in extended absences.  The Commissioner argues there was no error because the ALJ reasonably assessed the medical opinions and reasonably discounted Plaintiff's allegations of disabling impairments during the relevant period.  As is explained below, the Court agrees with the Commissioner and affirms the ALJ's nondisability finding.

**A.    Symptom Reports: Plaintiff fails to establish consequential error**

Plaintiff argues the ALJ failed to properly assess his subjective complaints regarding ulcerative colitis.  He argues that the ALJ erred by finding that he had stable symptoms despite frequent flare-ups, failed to account for the time that he would be off task due to bathroom breaks, erroneously focused on nonrelevant findings such as the fact that physical examinations showed a soft, non-tender abdomen, and the ALJ erred in reasoning that that Plaintiff did not take his medication by failing to consider that he did not have insurance.

1.    <u>Standard</u>

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry.  "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[12] Second, "[i]f the claimant meets the first test and there

_____

[12] *Molina*, 674 F.3d at 1112.

1   is no evidence of malingering, the ALJ can only reject the claimant's testimony

2   about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing

3   reasons' for the rejection."[13] General findings are insufficient; rather, the ALJ must

4   identify what symptom claims are being discounted and what evidence undermines

5   these claims.[14] "The clear and convincing standard is the most demanding required

6   in Social Security cases."[15] Therefore, if an ALJ does not articulate specific, clear,

7   and convincing reasons to reject a claimant's symptoms, the corresponding

8   limitations must be included in the RFC.[16]

9

10

11

_____

12

13  [13] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504

    F.3d at 1036).

14

15  [14] *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v.

    Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently

16

    explain why he discounted claimant's symptom claims)).

17

18  [15] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r

    of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

19

20  [16] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing

    reasons for finding Lingenfelter's alleged pain and symptoms not credible, and

21

    therefore was required to include these limitations in his assessment of

22

    Lingenfelter's RFC.").

23

1

2.    <u>Plaintiff's Testimony</u>

2

On October 6, 2022, Plaintiff and his attorney appeared before ALJ C. Howard

3

Prinsloo for a hearing.[17] Plaintiff testified and a vocational expert, Thomas Polsin,

4

testified.[18]  Plaintiff testified that ulcerative colitis is an active diagnosis and that

5

he has flare-ups.[19]  He said that he has the flare-ups on a regular basis with standard

6

symptoms of weight loss, loss of appetite and rectal bleeding.[20]  He testified that it

7

usually takes a month to get a flare-up under control and that a couple of times in

8

his life the flares required hospitalization and he lost 20-30 pounds and had to spend

9

months regaining the weight.[21]  He said that the diarrhea and loss of blood causes

10

fatigue, and that the first month is the worst but he then needs to spend the next

11

couple months recovering.[22] The average flare-up lasts for a month.[23]  He said that

12

for that month he has to stay home to be near a bathroom and that he eats little

13

14

15

16

[17] AR 34-58.

17

[18] *Id.*

18

[19] AR 38.

19

[20] AR 38-39.

20

[21] AR 39.

21

[22] *Id.*

22

[23] AR 40.

23

because he has no appetite.[24]  He said his problems are predominantly at night.[25] He said that it can take a few months to recover.[26] He said he last had a flare up in March.[27]

Plaintiff said that at least once a year he will have an accident and not reach a bathroom in time.[28] He will use the bathroom about 8 times a day but is usually quick and just about three minutes.[29]  He said that when he has a flare he uses the bathroom 10-20 times a day.[30] He tried working at Fedex but he had transportation issues because he had no license.[31] He worked at a construction job but it was an hour and half round-trip to the job.[32] His jobs were not close because he has a criminal record and he is leery of applying for jobs because of his record.[33]

---

[24] AR 39-40.

[25] AR 40.

[26] AR 41.

[27] AR 42.

[28] *Id.*

[29] AR 42-43.

[30] AR 43.

[31] AR 43-44.

[32] AR 44.

[33] AR 45.

Plaintiff said he takes toilet paper with him when he goes out because if there is no bathroom he will go "in the wild."[34]  He said that his ulcerative colitis has affected relationships with people who need to care for him.[35] He said that in the past he worked at McDonald's as a cook and they accommodated his condition and allowed him to take leave and to clock out when necessary.[36] Jack in the Box also accommodated him.[37] He said he also worked at a tire company in 2008 and most recently worked for Fedex.[38]  He said that he was not taking sulfasalazine because he did not like the side effects of medication and does not want to take medications daily.[39] When asked what side effect he gets from sulfasalazine he said he only takes it during flares so he has never had side effects.[40]

Plaintiff said he had a flare in 2018 while in jail and another in 2021, and that in between flares he takes vitamins.[41] He said that he also gets anemia during flare-

---

[34] AR 45-46.

[35] AR 46.

[36] AR 47.

[37] *Id.*

[38] AR 48.

[39] *Id.*

[40] *Id.*

[41] AR 49.

ups.[42] Plaintiff said he was 6' 3" and was his normal weight of 185 pounds but that when he had a flare-up in March 2021, his weight went down to 160.[43] He said he was 200 pounds when he got out of prison and that he was last incarcerated a year before.[44] He said that since Covid he got ordinary sicknesses like colds more often.[45] He said that he used to get an injection when he was on his father's insurance but that the medication caused diseases.[46] He said that he still has symptoms of ulcerative colitis and has occasional flare-ups.[47]

The vocational expert identified Plaintiff's past work as a cashier II (DOT 211.462-010), a sandwich maker (DOT 317.664-010), an agricultural produce sorter (DOT 529.687-186), a construction worker II (DOT 869.687-026), and a tire repairer (DOT 915.684-010).[48] Given a hypothetical consistent with the formulated RFC, the VE said that the individual would be able to perform his past work as a cashier, sandwich maker and agricultural produce sorter.[49] The VE said that Plaintiff could

---

[42] *Id.*

[43] *Id.*

[44] AR 50.

[45] AR 51.

[46] *Id.*

[47] *Id.*

[48] AR 53.

[49] AR 54.

also perform work as a kitchen helper (DOT 318.687-010), an auto detailer (DOT 915.687-034), and a motor vehicle assembler (DOT 806.684-010).[50] When asked if the inclusion of a limitation that the individual could have no concentrated exposure to respiratory irritants and temperature extremes, the VE stated that all jobs would remain except the motor vehicle assembler job.[51]  The VE offered a substitute job of an industrial cleaner (DOT 381.687-018) in place of the motor vehicle assembler job.[52] The VE stated that it would not impact the jobs if the individual needed to take bathroom breaks every hour as long as they did not exceed five minutes.[53] For the assembler position it would have been disruptive to take unscheduled breaks but the other three would remain.[54]  The VE said that the tolerance for absence is one day a month.[55] When asked if a two-week absence would be tolerated, the VE said that it would probably qualify for leave under the FMLA but probably only once during employment.[56]

---

[50] *Id.*

[51] *Id.*

[52] AR 55.

[53] *Id.*

[54] AR 55-56.

[55] AR 56.

[56] AR 56-57.

DISPOSITIVE ORDER - 12

3.    <u>The Medical Record</u>

Because Plaintiff's argument concerns only his physical condition, the Court includes on records relevant to that issue.

<u>Hayden Hamilton, MD</u>

On January 2, 2019, Plaintiff was examined by consultative examiner Dr. Hamilton at the request of the Commissioner.[57] Plaintiff reported that he had abdominal pain, blood in his stools, frequency, fatigue and low energy.[58] Plaintiff stated that he lived in an apartment with roommates and was independent in his activities of daily living, and that he was currently taking Sulfasalazine.[59] Plaintiff also reported that he worked part-time; that his activities included playing guitar, playing video games and watching Netflix; and that he drank about 10 alcoholic drinks a week.[60]  On examination, Plaintiff was pleasant and cooperative and in no acute distress; his gait was normal and he got on and off the exam table with no assistance; his vital signs were within normal limits; and the following systems were within normal limits: eyes, ears, chest and lungs, cardiovascular, pulses, skin, extremities, range of motion, straight leg raising, motor strength, sensory exam,

---

[57] AR 290-293.

[58] AR 290.

[59] *Id*.

[60] AR 291.

deep tendon reflexes, and cranial nerves.[61]  On examination, Plaintiff's abdomen was soft and nondistended, he had normal bowel sounds, and he was tender in the left lower quadrant to light palpation.[62]  Dr. Hamilton diagnosed ulcerative colitis and assessed the following limitations: could stand or sit for up to 8 hours a day, could lift 50 pounds occasionally and 25 pounds frequently, and should avoid working around extremes of temperature, chemicals, dusts, fumes and gases.[63]

### Washington State Department of Corrections

On August 7, 2018, Plaintiff presented to LMHC Hope Cox for depression.[64] She assessed him as suffering from major depressive disorder, recurrent, moderate.[65] On August 12, 2018, Plaintiff was seen by RN April Scott, who noted that he appeared requesting wet wipes.[66] RN Scott noted that Plaintiff's ulcerative colitis was successfully treated with sulfasalazine and that his exam results were within normal limits.[67]

---

[61] AR 291-293.

[62] AR 291.

[63] AR 293.

[64] AR 305.

[65] AR 306.

[66] AR 297.

[67] Id.

On October 8, 2018, Plaintiff denied any need for mental health services.[68] LMHC Hope Cox assessed Plaintiff's condition as major depressive disorder, in remission.[69]

On November 26, 2018, Plaintiff presented to PA Richard Oliver.[70] He requested additional food due to his ulcerative colitis but PA Oliver refused the request because he was 10 pounds heavier than he was at arrival and he felt supplemental nutrition was unnecessary.[71]

### Immediate Clinic

On November 7, 2019, Plaintiff presented to ARNP Tiffany Chiu Yeu, with complaints of body aches and gastroenteritis.[72] He reported diarrhea, nausea body and aches and chills sine the prior day.[73] He had eaten at Wendy's the prior day.[74] A rapid influenza test was negative and Plaintiff was diagnosed with gastroenteritis

---

[68] AR 300.

[69] AR 302.

[70] AR 296.

[71] *Id.*

[72] AR 321.

[73] AR 322.

[74] *Id.*

and body aches.[75] ARNP Yeu opined that his symptoms were likely viral and prescribed an antibiotic.[76]

On May 26, 2020, Plaintiff presented to PA Latoya Richards with chest congestion.[77] He complained of wheezing and having eye discharge since the day prior.[78] He was diagnosed with acute bronchitis and acute bacterial conjunctivitis of both eyes.[79] He was given an injection of prednisone and treated with albuterol.[80]

*Mountain View Medical Clinic*

On March 10, 2021, Plaintiff presented to ARNP Philip Yung of Mountain View Medical Clinic, with concerns of possible Covid, due to having nausea, vomiting and diarrhea for the last nine days.[81] He also reported a fever of 102 and changes in taste and smell.[82] A rapid Covid test was negative.[83]

---

[75] AR 323.

[76] AR 324.

[77] AR 340.

[78] AR 342.

[79] *Id.*

[80] *Id.*

[81] AR 413.

[82] *Id.*

[83] AR 414.

On March 23, 2021, Plaintiff presented to Yakima Valley Memorial Hospital Emergency Department complaining of ulcerative colitis since the beginning of the month, with fevers, blood in his stools and vomiting.[84]   Plaintiff complained of worsening abdominal pain since March 1, 2021.[85] Plaintiff was treated with ciprofloxacin, an antibiotic, and Flagyl, an anti-nausea medication and discharged with instructions to seek treatment with his PCP.[86]

*Yakima Gastroenterology Assoc*.

On April 15, 2021, Plaintiff presented to ARNP Tanda Ferguson of Yakima Gastroenterology Assoc., reporting that he was having a flare-up of his ulcerative colitis and needed treatment.[87] Plaintiff asked for a colonoscopy and to resume treatments.[88] Plaintiff reported that in March 2021 he began to experience abdominal pain, nausea, anorexia and change in his sense of taste, and had 15-20 stools per day, mostly at night.[89] Plaintiff reported that he stopped Remicade due to insurance issues but had been successfully treated with sulfsalizine when he was in

---

[84] AR 406.

[85] *Id.*

[86] AR 407.

[87] AR 386.

[88] *Id.*

[89] *Id.*

prison and had a flare-up.[90]    On examination, he denied vomiting, nausea, and heartburn; abdomen was soft and no distended with no guarding; there was left great than right lower tenderness; there was no hepatosplenomegaly; there were no masses palpated and bowel sounds were normal.[91]

On April 20, 2021, Tejas Kirtane, MD performed a colonoscopy on the referral of ARNP Ferguson and Dr. Chris Schmelzer.[92] Dr. Kirtane noted no complications during the procedure and states that the colonoscopy indicated normal terminal ileum, minimal patchy mucosal scarring in the right colon and no present colitis, normal left colon mucosa, and no polyps.[93] He opined that the overall findings suggested endoscopic remission.[94] Biopsy reports indicated that all specimens were within normal limits.[95]

On April 21, 2021, Plaintiff was contacted for a post-procedure telephone follow-up and reported that he was tolerating his diet and denied nausea, vomiting, bleeding, pain, difficulty swallowing, fever, site pain, redness or swelling.[96] He was

---

[90] *Id*.

[91] AR 386-387.

[92] AR 377.

[93] AR 378.

[94] Id.

[95] AR 392.

[96] AR 375.

scheduled for follow-up on June 1, 2021.[97] Plaintiff was not available to attend a prior appointment with ARNP Ferguson scheduled for April 28, 2021.[98] On May 17, 2021, Plaintiff requested a back-dated medical note for having missed alcohol classes, which was denied.[99]

On June 1, 2021, Plaintiff presented to ARNP Ferguson for a follow-up appointment for colonoscopy ulcerative colitis.[100] ARNP Ferguson noted that Plaintiff was 33 and had a history of ulcerative colitis since age 18, and had recently had a colonoscopy after a 15 pound weight loss and 15-20 bowel movements at a day.[101] Plaintiff had been prescribed Remicade but did not take it for two years due to insurance issues.[102] While in prison, Plaintiff was successfully treated with sulfsalazine.[103] He recently began treatment with sulfsalazine and reported improvement with 4-8 bowel movements per day, with less nausea and no problem with the eating.[104] ARNP Ferguson advised Plaintiff of the results of the recent

---

[97] Id.

[98] AR 383.

[99] AR 373.

[100] AR 370.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

colonoscopy.[105] She noted that the impression was ulcerative colitis in endoscopic remission and prescribed mesalamine.[106] On examination, Plaintiff's stomach was soft, and non-distended with no guarding; there was no hepatosplenomegaly; there were no masses palpated and bowel sounds were normal.[107]

On July 18, 2022, Plaintiff called ARNP Ferguson and requested a prescription for mesalamine.[108] It was noted that Plaintiff had "no showed" at his prior 2 appointments and had not picked up the medication, which was prescribed one year prior.[109]

### 4.    The ALJ's Findings

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms of his medically determinable impairments not entirely consistent with the medical evidence and other evidence in the record.[110]

With regard to Plaintiff's issues with her mental health, the ALJ articulated his reasoning as follows:

---

[105] AR 371.

[106] *Id.*

[107] *Id.*

[108] AR 367.

[109] AR 368.

[110] AR 23.

1
2
3
4

The record indicates that, apart from a short period of a flare-up of ulcerative colitis from March 2021 through April 2021, the claimant's ulcerative colitis symptoms have been stable since 2018. This includes a long period when he was on and off medications. First, there is little evidence of treatment or progress notes to establish that ulcerative colitis has caused significant limitation except for a flare up of ulcerative colitis until March 2021.[111]

5
6
7
8
9
10
11

The ALJ then went on to articulate that in January 2019, Plaintiff's examination was within normal limits with the exception of tenderness in the left lower quadrant to light palpation; that in November 2019, Plaintiff presented with diarrhea, nausea, and arthralgias[112] but had a normal abdominal findings with only mild abdominal tenderness despite the fact that he was not taking his medication; and that in May 2020, Plaintiff was doing well despite the fact that he had stopped taking the medication (sulfasalazine) prescribed to him in 2018 after one month.[113]

12
13
14
15

The ALJ considered that Plaintiff reported a flare-up in March 2021 through April 2021. He articulated that despite Plaintiff's complaints of abdominal pain, he displayed no tenderness in his abdominal area on examination, and that in April 2021, a colonoscopy showed only minimal scarring and no active colitis.[114]

16
17
18

[111] AR 23-24.

19
20

[112] AR 324. Treatment notes indicate that Plaintiff's symptoms were the result of a viral infection and not ulcerative colitis.

21

[113] AR 24.

22

[114] *Id*.

23

DISPOSITIVE ORDER - 21

The ALJ further articulated that when Plaintiff suffered his flare-up in March 2021, he had been off his medication Remicade for two and a half years and asserted that he could not afford medication because he had no insurance during this time period but records showed that he had state health insurance and that he had used his funds to purchase marijuana and alcohol.[115]  He also reasoned that Plaintiff's condition improved after he restarted sulfasalazine in April 2021, and that by the end of April 2021 his ulcerative colitis was considered "historical."[116] The ALJ then noted that when on medication Plaintiff's symptoms are generally well-controlled and that despite reports of improvement with medication, Plaintiff did not pick up the medication mesalamine which was prescribed in June 2021 until July 2022.[117]

The ALJ went on to reason further that:

The claimant's reported activities of daily living and social interaction, described above at Finding #2, are inconsistent with his allegations of severely limiting symptoms.  The claimant takes care of himself, cooks, does household chores, manages his own finances, drives, reads, plays guitar and video games, visits his daughter regularly, goes to concerts, bars, fishing, and camping (*See e.g.*, 4E; 1F2-3; 8F3; hearing testimony). These activities demonstrate that the claimant's ulcerative colitis has not been as limiting as alleged.

The record also contains evidence that suggests the claimant's current lack of employment is related to other factors than medical impairment. For example, his earnings record show that, after the SSI filing date,

---

[115] *Id*.

[116] *Id*.

[117] AR 25.

the claimant worked briefly for L-Boz Construction in 2019 and FedEx in 2021. At the hearing, he testified that that he stopped working because of transportation issues because he did not have a driver's license (hearing testimony). The record documented that he had a DUI charge in December 2019 (8F3). This shows that the claimant's ability to work is complicated by transportation issue.

His criminal history, rather than ulcerative colitis, is another reason for his current lack of employment. The record documented that the claimant was incarcerated for possession of a control substance, tampering with a witness, forgery, and a violation of a domestic violence court order (2F12). At the hearing, the claimant admitted that he has a difficult time to find work due to his criminal record (hearing testimony).[118]

4. <u>Analysis</u>

The ALJ's reasoning describes four instances in which he found Plaintiff's subjective allegations to be at odds with the record: that Plaintiff's condition was stable with benign examination findings and only one brief flare-up of several weeks between 2018 and the date of the hearing in October 2022; that Plaintiff's symptoms were mild enough that he did not take prescribed medication; that Plaintiff was able to engage in a wide range of activities of daily living; and that Plaintiff testified that his difficulty in maintaining employment was caused by things other than work.

    a.    <u>*Plaintiff's condition was stable with only one flare-up between 2018 and October 2022*</u>

---

[118] *Id.*

DISPOSITIVE ORDER - 23

ALJ found that the objective mental status findings in the record are not consistent with chronic debilitating symptoms and that Plaintiff suffered only one flare-up between 2018 and October of 2022.[119] Objective medical evidence—signs, laboratory findings, or both—is a relevant factor for the ALJ to consider when assessing a claimant's symptoms.[120] Here, the medical record also supports the ALJ's reasoning.

The medical evidence indicates that Plaintiff had a mild episode of colitis while he was incarcerated and was successfully treated with sulfasalazine.[121] Between 2018 and 2022 Plaintiff presented to medical providers at Immediate Clinic, and Mountain View Clinic, and Yakima Gastroenterology Associates. Plaintiff's treatment was limited, but he presented with viral gastroenteritis on November 7, 2019, to Immediate Clinic.[122]  Similarly, he presented on May 25, 2020, with complaints of wheezing and discharge from his eye.[123] In March of 2021, Plaintiff presented to Mountain View Medical Clinic with concerns that he had

---

[119] AR 23-24.

[120] 20 C.F.R. § 416.902(k); 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

[121] AR 386.

[122] AR 321.

[123] AR 340.

Covid.[124]  Plaintiff presented to Yakima Valley Memorial Hospital Emergency Department on March 23, 2019, complaining of ulcerative colitis and was restarted on his medication.[125]  Plaintiff's symptoms were controlled by April 15, 2021, when he presented to ARNP Ferguson and on examination he denied vomiting or nausea and had a soft, non-distended abdomen with no guarding.[126]  The ALJ also noted that Plaintiff's colitis was in remission by the end of April 2021.

Plaintiff characterizes the ALJ's findings as focusing on nonrelevant findings.  The Court disagrees.  While it is true that when discussing the finding of physical examinations, the ALJ included all of the findings--including the those regarding extremities and range of motion, for instance--the ALJ also cited examination findings such as a nontender abdomen, no mass detected, no guarding, and normal bowel sounds.  The fact that Plaintiff had normal findings on examination with only mild or no tenderness in his abdomen and normal bowel sounds is certainly relevant to whether he is suffering from colitis, which is an inflammation of abdominal organs.  Similarly, the fact that objective testing indicated a complete and speedy recovery following Plaintiff's March 2021 flare-up with minimal scarring is highly relevant and the ALJ did not err in considering it.

---

[124] AR 413

[125] AR 406.

[126] AR 386.

1

### b.   <u>Plaintiff failed to take prescribed medication</u>

2

Plaintiff argues that the ALJ erred in considering that he did not take his

3 prescribed medication for several years because he failed to consider that Remicade

4 is a costly drug and his state insurance might not have covered the cost.

5 A claimant's course of treatment, including an inadequately explained failure

6 to seek treatment, is a relevant factor for the ALJ to consider when assessing the

7 claimant's symptom reports.[127]  Whether a claimant seeks urgent emergency care is

8 not a controlling factor; rather, the ALJ must consider the nature of the impairment

9 and the type and nature of medical care received for the impairment.[128]   While

10 affordable or free local community resources may be a relevant factor for the ALJ to

11 consider when determining whether a claimant had good cause for not seeking

12 additional treatment, the ALJ must consider whether such resources are likely

13 available to the claimant.[129]

14

15 [127] 20 C.F.R. § 416.929(c)(3).

16 [128] *Ghanim*, 763 F.3d at 1164 (requiring the ALJ to consider the context of

17 treatment records and discouraging the discounting of a claimant's reported

18 symptoms based on nonrelevant normal findings).

19 [129] *See* SSR 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims

20 (requiring the ALJ to consider whether the individual is unable to afford treatment

21 and does not have access to free or low-cost medical services). *See, e.g.*, Program

22 Operations Manual System (POMS) 23010.011, How to Make a Failure to Follow

23

Plaintiff sought emergency care for influenza, bronchitis, conjunctivitis, and Covid, yet he only sought emergency treatment for ulcerative colitis on one single occasion.[130] His assertions that he did not seek care due to lack of insurance are contrary to the record because the record supports the ALJ's assertion that Plaintiff had state-funded medical insurance.

Plaintiff argues that Remidcade costs thousands of dollars and that there is no evidence that the medication was covered by his state health insurance.  But the ALJ has correctly pointed out that there is no evidence that the Plaintiff attempted to obtain coverage for the medication.[131]  More importantly, as the ALJ additionally considered, Plaintiff also failed to take other prescribed medications which are far

---

Prescribed Treatment (FTFPT) Determination (eff. Jan. 3, 2019) ("Follow your local business process to identify potential local community resources (i.e., clinics, charitable organizations, public assistance agencies). In most states, this means you must consult with the DDS public relations officer (PRO), and the PRO will consult directly with the individual regarding any potential assistance."); SSR 18-3p: Titles II and XVI: Failure to Follow Prescribed Treatment (placing the burden on the claimant to demonstrate why she does not have health insurance to pay for the prescribed treatment or why she failed to obtain treatment at the free or subsidized healthcare provider *if such is available*) (emphasis added).

[130] AR 321, 340, 406, 413.

[131] AR 24.

less costly than Remicade.[132]' Plaintiff's symptoms improved dramatically when he took his prescribed medication, sulfasalazine.[133] But Plaintiff admitted that he had only taken his prescribed medication, sulfasalazine for only one month and then discontinued it, despite the fact that he had been successfully treated with that medication both when he was in prison and in March 2021.[134]  Sulfasalazine is an inexpensive drug, which costs less than a six-pack of beer.[135]  The ALJ cannot be faulted for pointing out that Plaintiff spent money on beer but not on medication. A claimant's improvement with treatment is "an important indicator of the intensity and persistence of . . . symptoms."[136]

---

[132] AR 24-25.

[133] *Id.*

[134] AR 24, 386-387, 407.

[135] A one month supply of sulfasalazine would cost $11.56 at Walmart in Spokane, WA, or $16.06 at Rite-Aid Pharmacy in Spokane, WA, according to GoodRX. www.goodrx.com (January 10, 2024.)

[136] 20 C.F.R. § 416.929(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

The ALJ additionally considered that Plaintiff was prescribed mesalamine in June 2021 and did not bother to pick up the prescription until July 2022.[137] Although mesalamine is slightly more expensive than sulfasalazine, it is not prohibitively expensive and again, there is no evidence that Plaintiff even attempted to have the medication paid for by his insurance.[138] The Court thus cannot fault the ALJ for considering that Plaintiff was willing to spend his money on marijuana and alcohol, but not to take medication which would have cost 38 cents per day and which by all accounts successfully treated his symptoms.

        *c.*    <u>Activities</u>

The ALJ considered other factors when that Plaintiff's activities and abilities were inconsistent with her symptom reports.[139] If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of work-related functions, the ALJ may find these activities inconsistent with the reported disabling symptoms.[140] Here, the ALJ highlighted that Plaintiff's activities

---

[137] AR 25.

[138] A one month supply of mesalamine would cost $66.05 at Walmart in Spokane, WA, or $66.60 at Rite-Aid Pharmacy in Spokane, WA, according to GoodRX. www.goodrx.com (January 10, 2024.)

[139] AR 25.

[140] *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (superseded in part on other grounds by statute).

included cooking, doing household chores, managing his finances, driving, reading, playing guitar, playing video games, going to concerts and bars, fishing and camping.[141]

Plaintiff argues that the ALJ erred in failing to consider that the nature of his illness is that he will be was forced to take excessive time off when he has a flare-up and that he would have bowel movements eight times a day.

The court finds no error in the ALJ's reasoning regarding Plaintiff's ability to engage in a wide range of daily activities. The ALJ considered that Plaintiff frequently traveled and spent time in public places. Plaintiff is alleging that at times when he does not have a flare-up he needs to be close to a bathroom and cannot be in public. The fact that he is able to go to concerts and bars, which have limited restroom facilities, is an indication that his allegations of the urgency he has in seeking a restroom are inconsistent with his daily activities. The fact that Plaintiff regularly seeks to engage in activities in places where a restroom is not close at hand is inconsistent with his subjective allegations.

Plaintiff errs in asserting that the ALJ did not consider that he has frequent flare-ups during which he needs to use the restroom up to twenty times a day. As discussed above, the ALJ considered Plaintiff's claim that he has frequent flare-ups and found it inconsistent with the record that showed that between 2018 and 2022, Plaintiff had one single flare-up which lasted for approximately one month, and

---

[141] AR 25.

from which he fully recovered once he restarted his prescribed medication and suffered only minimal residual scarring, as evidenced by colonoscopy results.

Additionally, the records belies Plaintiff's claims that he would be precluded from work due to excessive bathroom breaks in an average day when he was not suffering from a flare-up. Plaintiff testified that he uses the bathroom about eight times a day but said that he is very quick and takes no more than three minutes.[142] When asked if taking eight bathroom breaks in a day would be excessive, the VE testified that with the exception of the job of motor vehicle assembler it would not be excessive as long as the breaks were for five minutes or less. Plaintiff is correct that the ALJ erred in finding that he could perform work as a motor vehicle assembler, but this error is harmless because the VE offered a substitute job of industrial cleaner (DOT 381.687-018) and stated that job would remain.[143]

Given the infrequency of Plaintiff's flare-ups, the VE testimony that Plaintiff's brief but frequent bathroom breaks do not preclude work, and the fact that Plaintiff frequently goes out in public and does not need to be near a restroom, the ALJ's reasoning with regard to Plaintiff's daily activities is supported by the record.

---

[142] AR 42-43.

[143] AR 55.

1

### d.    Other factors

2

3   The ALJ also highlighted that Plaintiff testified that he stopped working

4   because of transportation issues and that he had trouble finding a job because of

5   his criminal record.[144]  Plaintiff avers the ALJ erred in doing so.  The Court

6   disagrees.  Evidence of a poor work history that suggests a claimant is not

7   motivated to work is a permissible reason to discredit a claimant's claim that he is

8   unable to work.[145] Moreover, an ALJ may consider whether the claimant has not

9   worked for reasons unrelated to the alleged disability.[146]

10   Plaintiff argues that he has worked multiple jobs despite his criminal

11   history and that this shows that he has lost jobs due to the need for his employer to

12   accommodate him.  This is inconsistent with the record, however.  Plaintiff

13   testified that prior to being incarcerated he worked as a fast-food chef for two

14   separate employers (McDonald's and Jack in the Box) and that both accommodated

15

16   _____

17   [144] Id.

18   [145] See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); 20 C.F.R. §§

19   404.1529, 416.929 (work record can be considered in assessing reported symptoms).

20   [146] See Tommasetti, 533 F.3d at 1040; Bruton, 268 F.3d at 828 (sufficient reasons

21   for disregarding subjective testimony include stopping work for nonmedical reasons

22   and failure to seek care for allegedly disabling condition at the time claimant

23   stopped working).

his need for frequent bathroom breaks.[147]  The ALJ correctly recited Plaintiff's testimony that he tried working at Fedex but had transportation issues when he lost his license due to a DUI.[148] He also correctly recited Plaintiff's testimony that he left his construction job because it was an hour and half away and that he did not like to look for jobs closer to home because he does not want his criminal record disclosed.[149]

While Plaintiff is correct that his attempts to work might be supportive of his claim if he had been forced to leave due to his medical conditions, this was not the case by his own admission.  It was Plaintiff's testimony that he left his job at Fedex due to transportation issues and his construction job because he did not want to continue a 90-minute commute each way to work.  Plaintiff did not testify that his ability to perform his construction job was affected in any way by his condition and offered the sole explanation that it was due to other reasons.

The Court finds that the ALJ accurately recited the testimony and record and further concludes that the ALJ has adequately explained his reasoning.  The Court declines to remand as to this issue.

---

[147] AR 47.

[148] AR 43-44.

[149] AR 45.

1    5.    <u>Summary</u>

2    It is the ALJ's responsibility to review and evaluate the conflicting evidence

3    and Plaintiff's subjective complaints.[150] The ALJ meaningfully explained why he

4    evaluated Plaintiff's subjective complaints as he did, and these reasons are

5    supported by substantial evidence.

6    **IV.    Conclusion**

7    Accordingly, **IT IS HEREBY ORDERED**:

8    1.    The ALJ's nondisability decision is **AFFIRMED**.

9    2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 10 and**

10    **12,** enter **JUDGMENT** in favor of the **Commissioner**, and **CLOSE**

11    the case.

12    IT IS SO ORDERED. The Clerk's Office is directed to file this order and

13    provide copies to all counsel.

14    DATED this 6th  day of March, 2024.

15    _____

16    EDWARD F. SHEA
Senior United States District Judge

17

18

19

20

21

22    [150] *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999).

23